1 P.3d 383

2000-NMSC-012

In the Matter of THE PETITION OF PNM GAS SERVICES, A Division of Public Service Company of New Mexico, for A Revision to Its Rates, Rules, Forms and Charges Pursuant to Advice Notice Nos. 592, 593, and 594

PNM GAS SERVICES, a division of Public Service Company of New Mexico, Appellant,

v.

NEW MEXICO PUBLIC UTILITY COMMISSION, Appellee,

v.

NEW MEXICO ATTORNEY GENERAL, Cross–Appellant,

and

INCORPORATED COUNTY OF LOS ALAMOS, Intervenors.

No. 24148.

Supreme Court of New Mexico.

April 17, 2000.

Keleher & McLeod, P.A., Robert H. Clark, Clyde F. Worthen, Thomas C. Bird, Albuquerque, Bill R. Garcia, Public Service Company of New Mexico, Albuquerque, for Appellant.

New Mexico Public Utility Commission, Anastasia S. Stevens, Commission Counsel, Santa Fe, for Appellee.

Patricia A. Madrid, Attorney General, Jeff Taylor, Assistant Attorney General, Santa Fe, for Cross–Appellant.

Virtue, Najjar & Bartell, P.C., Daniel A. Najjar, Santa Fe, for Intervenors.

## OPINION

SERNA, Justice.

{1}   PNM Gas Services (PNMGS), a division of Public Service Company of New Mexico (PNM), petitioned the New Mexico Public Utility Commission (Commission) for a rate increase in the amount of approximately $13.3 million. Following a full hearing before a hearing examiner concerning PNMGS's gas rates in Case No. 2662, the hearing examiner determined that PNMGS's then-existing rates were not fair, just, and reasonable and recommended that PNMGS's rates be decreased by $547,184. In a final order, the Commission denied PNMGS's requested rate increase, and the Commission ordered a reduction in PNMGS's gas rates by approximately $6.9 million. PNMGS appeals from the Commission's final order and requests that this Court vacate and annul the order.

{2}   PNMGS raises numerous issues on appeal which, according to PNMGS, indicate that the Commission acted unlawfully or unreasonably: (1) the Commission denied recovery of $5.9 million in costs incurred in retiring high cost debt; (2) the Commission denied recovery of $11.4 million in rate discounts granted to transportation customers under a newly established cost/benefit test; (3) the Commission denied recovery of over $7 million in fees paid to reserve gas under two gas purchase agreements; (4) the Commission denied recovery of $457,000 in expenses incurred in the settlement of litigation between PNMGS and Mewbourne Oil Company; (5) the Commission denied all recovery of rate case expenses; (6) the Commission accepted a thirty-year weather normalization instead of PNMGS's proposed ten-year weather normalization; and (7) the Commission accepted the Commission Staff's proposed rate of return over PNMGS's proposed rate of return. PNMGS asserts two additional issues with which the Attorney General, in a cross-appeal, joins: (1) the Commission rejected PNMGS's and the Attorney General's request to change the rate design in the recovery of reliability costs through a mechanism labeled Rate Rider 12; and (2) the Commission increased the residential access charge by $5.56, even though PNMGS requested an increase of only $1.00.

{3}   We believe that evidence in the record supports the Commission's decision to apply a cost/benefit test in disallowing Rate Rider 8 discounts, to adopt the proposed

thirty-year weather normalization, to accept Staff's proposed rate of return, and to decline to change the rate design through the Rate Rider 12 mechanism; however, we hold that the Commission's conclusions concerning reacquired debt and the residential access charge, as well as the Commission's decision to deny PNMGS the opportunity to recover reservation fees in a separate proceeding and to deny in their entirety the Mewbourne settlement expenses and rate case expenses, are not supported by substantial evidence in the record. As a result, we vacate and annul the Commission's final order.

## I. Standard of Review

■ {4} Under the Public Utility Act, this Court "shall vacate and annul the order complained of if it is made to appear to the satisfaction of the [C]ourt that the order is unreasonable or unlawful." NMSA 1978, § 62–11–5 (1982, repealed effective July 1, 2003).

> The scope of review of Commission decisions is limited to the question of whether the Commission acted fraudulently, arbitrarily or capriciously, whether the decision is supported by substantial evidence, and, generally, whether the actions of the Commission are within the scope of its authority. Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Attorney Gen. v. New Mexico Pub. Serv. Comm'n,* 101 N.M. 549, 553, 685 P.2d 957, 961 (1984) (citation omitted). Because of the multiple roles inherently served by agencies such as the Commission in administrative proceedings, *see Duke City Lumber Co. v. New Mexico Envtl. Improvement Bd.,* 101 N.M. 291, 294, 681 P.2d 717, 720 (1984), this Court reviews the whole record, including both the evidence in favor of and the evidence contrary to the Commission's decision, in order to determine whether the decision is supported by substantial evidence. *See id.* at 293, 681 P.2d at 719. PNMGS, and the Attorney General with respect to the cross-appeal, must bear the burden of demonstrating that the Commission's order is unreasonable or unlawful, NMSA 1978, § 62–11–4

(1965), and "this Court must view the evidence in the light most favorable to the decision made by the Commission." *Attorney Gen.,* 101 N.M. at 553, 685 P.2d at 961.

## II. General Principles Implicated in a Rate Case

■ {5} In the context of a general rate case, the Legislature has delegated exclusive authority to the Commission to set the rates charged by PNMGS. *See* NMSA 1978, § 62–6–4(A) (1996, repealed effective July 1, 2003). The Commission "is vested with considerable discretion in determining the justness and reasonableness of utility rates." *Attorney Gen.,* 101 N.M. at 553, 685 P.2d at 961; *accord* NMSA 1978, § 62–8–7 (1991, prior to 1998 amendment, repealed effective July 1, 2003).

■ {6} Generally, the Commission establishes a utility's rates based on the utility's revenue requirement, which is determined through an assessment of a number of different factors. "The traditional elements of the rate-making process and the establishment of the total revenue requirement are (1) determination of the costs of the operation, (2) determination of the rate base which is the value of the property minus accrued depreciation, and (3) determination of the rate of return." *Hobbs Gas Co. v. New Mexico Pub. Serv. Comm'n,* 94 N.M. 731, 733, 616 P.2d 1116, 1118 (1980). The ratemaking process is prospective in nature in that "[p]ast deficits may not be made up by excessive charges in the future nor may past profits be reduced by disallowances to future operating expense." *Mountain States Tel. & Tel. Co. v. New Mexico State Corp. Comm'n,* 90 N.M. 325, 341, 563 P.2d 588, 604 (1977) (quoted authority omitted); *accord Behles v. New Mexico Pub. Serv. Comm'n (In re Application of Timberon Water Co.),* 114 N.M. 154, 161, 836 P.2d 73, 80 (1992). The setting of rates thus requires a certain amount of prediction by the Commission concerning a utility's future revenue requirement. Although "there is no way of learning precisely what it will cost to render any particular service," *Mountain States,* 90 N.M. at 338, 563 P.2d at 601, the Commission attempts to predict with reasonable accuracy a utility's future operat-

ing costs by utilizing a test-year method. Under the historical test-year method employed by the Commission in this case, the Commission evaluates a utility's operating costs for a specified preceding twelve-month period and uses the utility's past experience as a guide to the utility's future revenue requirement. *See* Charles F. Phillips, Jr., *The Regulation of Public Utilities* 188 (2d ed.1988).

{7} Because of the level of complexity involved in setting rates and the number of variables at issue in every rate proceeding, the Commission is "not bound to the use of any single formula or combination of formulae in determining rates. The rate-making function involves the making of pragmatic adjustments. It is the result reached, not the method employed, which is controlling." *Mountain States*, 90 N.M. at 338, 563 P.2d at 601, *quoted in Hobbs Gas Co.*, 94 N.M. at 734, 616 P.2d at 1119; *accord State ex rel. Sandel v. New Mexico Pub. Util. Comm'n*, 1999–NMSC–019, ¶ 15, 127 N.M. 272, 980 P.2d 55. Within this flexible framework, the Commission must balance

> the interest of consumers and the interest of investors ... to the end that reasonable and proper services shall be available at fair, just and reasonable rates, and to the end that capital and investment may be encouraged and attracted so as to provide for the construction, development and extension, without unnecessary duplication and economic waste, of proper plants and facilities for the rendition of service to the general public and to industry.

NMSA 1978, § 62–3–1(B) (1967, repealed effective July 1, 2003).

{8} Ultimately, the Commission must ensure that rates are neither unreasonably high so as to unjustly burden ratepayers with excessive rates nor unreasonably low so as to constitute a taking of property without just compensation or a violation of due process by preventing the utility from earning a reasonable rate of return on its investment. *See* NMSA 1978, § 62–8–1 (1953, repealed effective July 1, 2003) ("Every rate made, demanded or received by any public utility shall be just and reasonable."); *see also General Tel. Co. v. Corporation Comm'n (In re Application of General Tel. Co.)*, 98 N.M. 749, 753, 652 P.2d 1200, 1204 (1982) ("[T]he failure of [a utility commission] to provide rates that will give the company a reasonable rate of return constitutes a violation of due process and a taking of property without just compensation."). A reasonable rate of return is one that provides a fair opportunity for the utility to receive just compensation for its investments, *Mountain States*, 90 N.M. at 334, 563 P.2d at 597, and that fulfills the statutory goal in Section 62–3–1(B) of enabling the utility "to attract new capital to maintain, improve, and expand its services in response to consumer demand." Phillips, *supra*, at 170. "There is a significant zone of reasonableness ... between utility confiscation and ratepayer extortion." *Behles*, 114 N.M. at 161, 836 P.2d at 80.

{9} Although "[t]he Commission is vested with considerable discretion in determining whether a rate to be received and charged is just and reasonable," *Hobbs Gas Co.*, 94 N.M. at 733, 616 P.2d at 1118, and the Commission must have "the ability ... to adapt to changes in circumstances in the rate-making determination from one year to the next," *id.* at 736, 616 P.2d at 1121, the Commission is not free to disregard its own rules and prior ratemaking decisions or "to change its position without good cause and prior notice to the affected parties." *Hobbs Gas Co. v. New Mexico Pub. Serv. Comm'n*, 115 N.M. 678, 681, 858 P.2d 54, 57 (1993). In this context, we apply a five-factor balancing test, articulated in *Retail, Wholesale & Department Store Union v. NLRB*, 466 F.2d 380, 390 (D.C.Cir.1972), to determine whether an agency's change from a prior position may be applied retroactively:

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Retail, Wholesale,* 466 F.2d at 390, *quoted in Hobbs Gas Co.,* 115 N.M. at 682, 858 P.2d at 58.

{10} If we determine under the applicable standard of review that the Commission's order in a rate proceeding is unlawful or unreasonable, we "have no power to modify the action or order appealed from;" instead, we must vacate and annul the order en toto. NMSA 1978, § 62–11–5 (1982, repealed effective July 1, 2003). "However, we are not precluded from declaring or determining that parts of a Commission order are unlawful and/or unreasonable (which requires vacating and annulling en toto) but at the same time declaring other parts of the order to be reasonable and lawful." *Hobbs Gas Co.,* 115 N.M. at 680, 858 P.2d at 56. With these general principles in mind, we turn to the specific issues presented by PNMGS on appeal.

### III. Reacquired Debt

{11} PNMGS sought to recover adjusted net losses on reacquired debt derived from a gross loss of $5,990,800 at the end of the base period. PNMGS's costs on reacquired debt stemmed from two instances of debt refinancing by PNM. PNM operates both PNMGS, which is a gas utility, and an electric utility through two separate divisions that are independently regulated by the Commission. In 1986, PNM separately refinanced approximately $54.6 million, $55.2 million, and $60.45 million of its high-cost debt, which was in the form of first mortgage bonds. In Case No. 2147, PNMGS's most recent litigated rate case before the Commission prior to the present proceeding, PNMGS sought to recover the portion of PNM's net losses from reacquired debt incurred in 1986 that were attributable to the gas utility division of the company. The Commission, in that rate case, permitted PNMGS to recover those costs, a total of approximately $8.5 million, through rate base treatment and amortization recovery. At the end of the test-year period utilized in the present proceeding, PNMGS maintained on its books losses of approximately $5.5 million associated with the cost of reacquiring debt in 1986. On a separate occasion, in 1994,

PNM retired additional high-cost debt of approximately $45 million. PNMGS experienced losses of approximately $400,000 associated with the 1994 refinancing, for which PNMGS had not previously sought recovery.

{12} In the present proceeding, PNMGS petitioned the Commission to recover the costs of reacquiring debt in 1986 and 1994. Specifically, PNMGS sought continued recovery of the $5.5 million in losses on reacquired debt remaining from 1986 and the $400,000 in losses on reacquired debt incurred in 1994. After offsetting for gains associated with the reacquired debt, PNMGS proposed to recover adjusted net losses on reacquired debt of $359,857 in annual amortization expenses and to include the remaining unamortized balance of $4,648,695 in the rate base.

{13} The Attorney General's expert witness, James D. Cotton, explained the process involved in reacquiring high-cost debt.

> Bonds, or long-term debt, are generally a significant component of a utility's capital structure. Loss on reacquisition of debt usually happens when a utility acquires some of its older bonds which have higher interest rates than current rates in the debt market. In order for a utility to reacquire an old bond issuance that carries a higher than current market interest rate, it must pay a premium over the face value of its bond. . . . Since the utility and its investors paid *more* than face value for the bonds, the utility has taken a loss upon reacquiring the bonds, and the utility has effectively increased its investment in the utility. That is why the "loss" is added to rate base and this amount is amortized to expense for ratemaking purposes over the remaining life of the bonds.

For the reasons expressed by Mr. Cotton, the Commission has previously allowed PNMGS and other utilities to recover losses on reacquired debt. Indeed, "a nearly unanimous consensus of state regulatory bodies agree that gains as well as losses resulting from the repurchase of debentures should be passed on to ratepayers." *Washington Gas Light Co. v. Public Serv. Comm'n,* 450 A.2d 1187, 1216 (D.C.1982). The Commission established in Case No.1916 that it would permit recovery for losses on reacquired debt as

long as the utility demonstrated that the benefit to current and future ratepayers exceeds the costs associated with the reacquisition.

{14} The Commission Staff and the Attorney General advocated against recovery of losses on reacquired debt in the present rate case due to the methodology used in establishing the rate of return for PNMGS. In determining a reasonable rate of return for a utility, the Commission considers several factors, including the utility's capital structure, which refers to the ratio between the company's debt and equity, and the utility's cost of capital, which, according to Staff witness James Brack, represents the "weighted average of individual rates on long term debt, preferred stock, and common equity." *See* Phillips, *supra,* at 369 (describing cost of capital as a "composite of the cost of the several classes of capital used by a utility—debt, preferred (and preference) stock, and common stock . . .—weighted on the basis of an appropriate capital structure"). PNMGS, as a division of PNM, has neither debt and equity in its own name upon which to base the cost of capital nor an actual capital structure of its own. Furthermore, compared to less risky A-rated utility companies, PNM is a more risky BB junk-bond-rated company, and the business operating risks associated with PNM's electric utility division are significantly different from those applicable for PNMGS. PNMGS believed that it was important to relieve its ratepayers from the risks and problems associated with the electric utility division of PNM. As a result, PNMGS proposed the use of a hypothetical, or imputed, capital structure and a hypothetical cost of capital, including a hypothetical cost of debt. Specifically, even though PNMGS would likely not be treated as an A-rated company if it existed as a separate entity, PNMGS proposed to treat the gas utility division of PNM as if it were a separate A-rated company. PNMGS developed a hypothetical capital structure and cost of debt on the basis of eight A-rated natural gas distribution companies. PNMGS asserted that a hypothetical capital structure and cost of debt would benefit ratepayers by lowering PNMGS's overall cost of capital. Thus, although PNM has a cost of debt of 7.76%,

PNMGS proposed the use of an imputed cost of debt of 7.56%.

{15} Staff also utilized a hypothetical capital structure and cost of capital in calculating the appropriate rate of return for PNMGS. Staff, like PNMGS, used eight A-rated natural gas distribution companies in formulating a hypothetical capital structure but proposed a cost of debt of 7.30%, instead of PNMGS's proposed 7.56%, based on more current data available at the time Staff submitted the pre-filed testimony of its expert, Mr. Brack. In addition, the Attorney General's expert, Mr. Cotton, testified that the use of a hypothetical capital structure and cost of capital for PNMGS was appropriate in this proceeding. However, Staff and the Attorney General relied on the use of a hypothetical capital structure and cost of debt in opposing recovery of losses on reacquired debt.

{16} According to the Attorney General's expert, Mr. Cotton, "[c]apital structure and the cost of debt are directly related to the amount of debt reacquired." Mr. Cotton further explained that "[t]he result of reacquiring long-term debt is a lower actual cost of debt." Thus, "[i]f the Company had used its actual capital structure at test period end, then, of course, its adjustment for gains and losses on reacquired debt might have been appropriate." However, PNMGS had proposed a hypothetical capital structure and cost of debt, and, according to Mr. Cotton, "[i]t is inconsistent for the Company to claim the loss on reacquiring debt but not to then use the lower cost of debt that resulted from the Company's actions. In the Company's proposal, the result is that ratepayers receive none of the benefit of the debt reacquisition." Similarly, Staff's expert, Dennis Gee, testified that "it is not likely that the benefits to ratepayers of these transactions can be shown in this proceeding. . . . Staff believes that the necessary nexus cannot be drawn between any benefits from gain/loss on reacquired debt transactions because these [affect] the actual capital structure and cost of capital but . . . [do] not [affect] an imputed capital structure and cost of capital."

{17} Based on this testimony, the Commission determined "that PNMGS has failed, therefore, to carry its burden of prov-

ing that the costs of losses on reacquired debt are outweighed by the cost of capital benefits to ratepayers." The Commission further determined that it was not bound by prior decisions allowing recovery of losses on reacquired debt, including Case No. 2147, because none of those cases involved a rate of return based on both an imputed capital structure and an imputed cost of debt. The Commission concluded that "PNMGS's request to use an imputed cost of debt in its cost of capital ... has made direct measurement of the debt reacquisition's effect on rates impossible." Finally, the Commission determined that, due to the substantial benefits realized by shareholders from the reacquired debt, estimated by the Commission to be approximately $80 million on a company-wide basis, PNM would have "undertaken the debt retirements had it anticipated that the losses on reacquired debt would be disallowed in rates," and denied all recovery of the losses.

{18} After reviewing the record as a whole, we believe the Commission's decision to disallow recovery of losses on reacquired debt is not supported by substantial evidence. We first address the Commission's determination that PNMGS failed to carry its burden of proof. Although PNMGS's use of an imputed capital structure and an imputed cost of debt made it difficult to calculate directly the extent of benefit realized by ratepayers, PNMGS nonetheless contended that the reacquisition of debt allowed it to utilize an imputed cost of debt in calculating its revenue requirement and that the imputed cost of debt was itself a benefit that ratepayers received from the retirement of high-cost debt. According to PNMGS's expert, Thomas Sategna, PNMGS's actual cost of debt would have been 10.82% if PNM had not retired the high-cost debt at issue in the rate proceeding. Comparing this figure to the proposed 7.56% imputed cost of debt and using PNMGS's proposed imputed capital structure, Mr. Sategna calculated that PNMGS's annual revenue requirement would have been approximately $2.37 million higher in the absence of the reacquisition of debt in 1986 and 1994. Dr. Charles Moyer testified that

[i]t is only because PNM has prudently seized opportunities to lower its embedded cost of debt ... that PNMGS has been able to adopt the comparable firm capital structure and debt costs. Without having taken these actions to lower its imbedded debt costs, PNMGS would have sought full recovery of its actual imbedded debt costs and it would have sought a return on equity consistent with its current financial condition (as reflected in its junk bond status).

Another PNMGS expert, J. Patrick Keene, testified that "[t]he nexus can be drawn between" the costs of reacquiring debt in 1986 and 1994 and the benefits realized by ratepayers. "Absent PNM's actions to reduce its cost of long term debt, PNMGS would have been unable to include a cost of debt comparable to financially healthier companies in this proceeding." Thus, PNMGS contended that the lower overall cost of capital from its proposed imputed cost of debt, made possible by the reacquisition of high-cost long-term debt, resulted in a substantial benefit to ratepayers. Additionally, PNMGS experts testified that ratepayers also received an indirect benefit of a more financially stable utility. *Cf. Arkansas La. Gas Co.*, 150 Pub. Util. Rep. 4th (PUR) 333, 361, 1994 WL 121423 (Ark. Pub. Serv. Comm'n 1994) (adopting a utility's proposed actual cost of debt but reviewing expert testimony by a staff witness proposing a hypothetical cost of debt and including recovery for losses on reacquired debt because, although difficult to quantify, the reacquired debt provided some benefit to ratepayers).

{19} While not disputing PNMGS's contention that the reacquisition of debt enabled the utilization of an imputed cost of debt that was lower than PNM's actual cost of debt, the Commission rejected PNMGS's calculation of the benefit received by ratepayers in using the imputed cost of debt. The Commission determined that the calculations were not persuasive due to Mr. Sategna's use of the proposed imputed capital structure to derive the amount of $2.37 million. According to the Commission, PNMGS failed to carry its burden of proof by not providing additional calculations based on its actual capital structure. Based on our review of the record as a whole, however, we believe

this determination was arbitrary and capricious. As previously mentioned, Staff also utilized a hypothetical capital structure in its calculations, and the Attorney General's expert testified that the use of a hypothetical capital structure was appropriate. In fact, PNMGS has no actual capital structure of its own. Although, in denying recovery for losses on reacquired debt, the Commission referenced testimony by Mr. Cotton, the Attorney General's expert, that an imputed capital structure was not in the best interests of ratepayers, we believe the Commission disregarded the context of Mr. Cotton's remark. Mr. Cotton further testified that using the actual capital structure would have been inappropriate, and he utilized the proposed imputed capital structure in his calculations "because it is more representative of the parent's (PNM) capital structure during the time that rates will actually be in effect than the base period (actual) capital structure." Indeed, the Commission's reference to Mr. Cotton's comment concerning ratepayer benefit can only be regarded as spurious due to the Commission's ultimate wholesale adoption of the hearing examiner's recommendations regarding the proposed imputed capital structure. The hearing examiner concluded that the capital structure for PNM's electric utility division was unrelated to PNMGS, that the two utility divisions had significantly different operating risks, and that, therefore, the use of PNMGS's proposed hypothetical capital structure was just and reasonable.

{20} Further, the Commission had previously adopted the use of a hypothetical capital structure in determining an appropriate rate of return for PNMGS in Case No. 2147, yet the Commission expressed no concern in that rate case that an imputed capital structure would prevent a cost/benefit analysis with respect to losses on reacquired debt. In fact, the Commission allowed recovery of such losses in Case No. 2147 without requir-

ing additional calculations utilizing an actual capital structure. Under these circumstances, we do not believe that the Commission provided adequate notice to PNMGS that additional proof would be necessary. With respect to the adequacy of PNMGS's offer of proof, we believe it is significant that nearly all of the losses at issue concerned the proposed continued recovery of losses which the Commission had previously held in Case No. 2147 to confer a benefit to ratepayers in excess of the costs associated with reacquisition. Therefore, we reject the Commission's determination that PNMGS failed to carry its burden of proof.

{21} As a related matter, we reject the Commission's determination that changed circumstances justified a departure from its previous decisions. The Commission deemed this a "unique" case because of the use of both an imputed capital structure and an imputed cost of debt. The Commission determined that the use of an imputed cost of debt constituted a changed circumstance justifying departure from Case No. 2147 because PNMGS could not demonstrate a benefit to ratepayers. As discussed above, however, because the imputed cost of debt in this case was lower than PNM's actual cost of debt, we believe that PNMGS's rate of return methodology did not prevent it from carrying its burden by showing that the benefit to ratepayers in the use of an imputed cost of debt outweighed the costs associated with the retirement of high cost debt.[1] In addition, considering that the vast majority of losses on reacquired debt were approved by the Commission in Case No. 2147 and considering that PNMGS has no actual capital structure or cost of debt of its own, PNMGS reasonably relied on the Commission's prior determinations concerning losses on reacquired debt. A "radical departure from past practice . . . without sufficient pri-

---

1. Mr. Cotton implied that losses on reacquired debt should be denied because PNM may have been improperly attempting to shift to ratepayers the costs necessary to counteract PNM's negative retained earnings due to losses incurred in non-regulated activities such as banking and real estate. By explaining in rebuttal and on cross-examination of Mr. Cotton that the debt retired by PNM was issued prior to the experience of negative retained earnings, we believe that PNMGS effectively negated Mr. Cotton's suggestion of a relationship between PNM's losses from non-regulated activities and the bulk of the costs from reacquired debt that PNMGS sought to recover. Thus, viewing the record as a whole, we conclude that the Commission's reliance on this factor as a changed circumstance is not supported by substantial evidence.

or notice of departure and without reasonable justification as reflected by the record ... [is] improper." *General Tel. Co.*, 98 N.M. at 756, 652 P.2d at 1207. Applying the five-factor test adopted in *Hobbs Gas Co.*, 115 N.M. at 682, 858 P.2d at 58, we conclude that although the Commission's order in this case, to a limited extent, fills a void in the law with respect to the use of an imputed cost of debt, the slight interest in applying the Commission's new rule is outweighed by PNMGS's reasonable reliance on the Commission's prior practice and the significant burden imposed under the new rule.

{22} We also reject the Commission's final basis for denying recovery of losses on reacquired debt: shareholder benefit. The appropriate test for the recovery of losses on reacquired debt is not whether the utility would have retired the debt irrespective of rate case recovery; instead, as the Commission established in Case No. 1916, the proper test is whether the benefits to ratepayers outweigh the costs associated with the reacquisition. Nevertheless, we agree with the Commission that the relationship between shareholder and ratepayer benefit related to the reacquisition of debt is an important concern; however, as indicated by Mr. Cotton's testimony concerning the basis for recovery of losses on reacquired debt quoted above in Paragraph 13, the Commission's established methodology of amortizing losses as an expense and including unamortized amounts in the rate base, coupled with a lower cost of debt in calculating the overall cost of capital, achieves a proper balance between shareholders and ratepayers. *Cf. Southern Bell Tel. & Tel. Co.*, 159 Pub. Util. Rep. 4th (PUR) 425, 436, 1994 WL 791922 (S.C. Pub. Serv. Comm'n 1994) (stating that amortization and rate base treatment "provides a sharing of refinancing costs between the ratepayer and the shareholder" and "does not allow [the utility] to overrecover its costs"). In this case, Staff's proposed imputed cost of debt of 7.30%, which was adopted by the Commission, represented a lower cost of debt that inured to the benefit of ratepayers.

{23} It appears that the Commission believed that the use of an imputed capital structure disrupted the balance between ratepayers and shareholders. According to the Commission, "for ratepayers to obtain the full benefits of a loss on reacquired debt, one must apply the lower actual cost of debt to the actual capital structure, which *presumably* has a much greater percentage of debt than the imputed capital structure." (Emphasis added.) While it is true that an imputed capital structure can impact the balance between ratepayers and shareholders by potentially exaggerating or understating the extent to which reacquired debt decreases the overall cost of long-term debt, there is no evidence in the record indicating that PNMGS's proposed imputed capital structure tipped the balance in favor of shareholders. We therefore conclude that the Commission's reliance on shareholder benefit, a factor not previously considered by the Commission with respect to losses on reacquired debt, is not supported by substantial evidence.

{24} Beyond the lack of substantial evidence in the record to support the Commission's decision to deny recovery of losses on reacquired debt, we are troubled by the punitive aspects of the Commission's reasoning. The Commission broadly determined that recovery for losses on reacquired debt is inconsistent with a rate of return methodology based on an imputed cost of debt. As the hearing examiner noted in reference to the positions of Staff and the Attorney General, however, PNMGS, under this view, "could never recover loss on reacquired debt if the Commission were to determine that an imputed capital structure and cost of capital were proper for ratemaking purposes." The Commission, in response to this criticism, determined that a complete bar to recovery was appropriate because "it was PNMGS's choice in this case ... to use an imputed cost of debt as well as an imputed capital structure and an imputed, comparable group cost of equity." As noted above, PNMGS does not have an actual capital structure or cost of debt of its own. Additionally, although PNMGS proposed the use of an imputed cost of debt, the ultimate decision to implement that proposal rested with the Commission. Further, as reflected by the expert testimony in this case, the Commission has the power

to adopt an imputed cost of debt and an imputed capital structure for purposes of ratemaking even if it is not initially proposed by the utility. *See Zia Natural Gas Co. v. New Mexico Pub. Util. Comm'n (In re Petition by Zia Natural Gas Co.)*, 2000–NMSC–011, ¶ 10, 128 N.M. 728, 998 P.2d 564; *cf. United Water Del., Inc. v. Public Serv. Comm'n*, 723 A.2d 1172, 1174 (Del.1999). Dr. Moyer, PNMGS's expert, testified that PNM would have been imprudent not to refinance its high-cost debt, and there is no evidence in the record that the losses incurred by PNM in reacquiring debt were imprudent. The Commission's determination of an inconsistency between losses on reacquired debt and an imputed cost of debt would appear to apply regardless of the amount of a utility's losses, whether the losses were prudently incurred, and the extent of benefit realized by ratepayers.

{25} We believe it is improper for the Commission to penalize PNMGS for its proposed methodology, a methodology supported by the Attorney General and Staff, found just and reasonable by the hearing examiner, and ultimately adopted by the Commission, by prohibiting the utility from having an opportunity to recover costs that were, undisputedly, prudently incurred. We believe that such a blanket rule fails to achieve a fair balance between ratepayers and investors. *See* § 62–3–1(B). *See generally Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944) ("From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business.... [T]he return to the equity owner ... should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." (citation omitted)), *quoted in State v. Mountain States Tel. & Tel. Co.*, 54 N.M. 315, 336, 224 P.2d 155, 169 (1950). While it is true that "[n]either New Mexico case law nor the Public Utility Act imposes any one particular method of valuation upon the Commission in ascertaining the rate base of a utility," *Hobbs Gas Co.*, 94 N.M. at 734, 616 P.2d at 1119, we believe that the Commission's decision to deny recovery for losses

on reacquired debt in this case, without support in the record and contrary to the Commission's previously established policy, is unreasonable and unlawful.

## IV. Issues Related to Take–or–Pay Costs

{26} Prior to the mid–1980's, it was common for long-term gas purchase contracts to include a take-or-pay clause, which "requir[es] the purchaser to take, or failing to take, to pay for the minimum annual contract volume of gas which the producer-seller has available for delivery," 8 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* 1069–70 (Patrick H. Martin & Bruce M. Kramer eds., 1999). *See* 4 *id.* § 724.5. Because of a decrease in the demand for natural gas and a decline in the price of gas during the 1980's, however, local distribution companies (LDC's), such as PNMGS, attempted to avoid the harsh effects of take-or-pay provisions, and in addition to actions by federal and state regulatory agencies, nationwide litigation arose between gas producers and LDC's. *See generally General Motors Corp. v. Public Serv. Comm'n*, 87 Md.App. 321, 589 A.2d 982, 983–86 (1991). As a result, PNMGS incurred substantial costs, including costs associated with contract renegotiation, penalties for violating take-or-pay clauses, and expenses incurred in the settlement of litigation, including attorney's fees. These costs became known as producer take-or-pay (PTOP) costs.

{27} In a prior proceeding, Case No. 2183, the Commission accepted a stipulation that distributed PTOP costs between ratepayers and PNMGS shareholders. According to the stipulation, shareholders would absorb 25% of the PTOP costs at issue in Case No. 2183, and ratepayers would be responsible for the remaining 75%. The stipulation provided that the portion of PTOP costs recoverable from ratepayers would be collected through a rate rider and would be collected from all customer classes on a volumetric basis. A number of issues raised by PNMGS on appeal relate, either directly or indirectly, to PTOP costs.

### A. Rate Rider 8 Discounts

{28} In Case No. 2340, the Commission addressed the proper interpretation and im-

plementation of the stipulation concerning PTOP costs adopted in Case No. 2183. The Commission established a tariff mechanism, labeled Rate Rider 8, that would allow PNMGS to recover the ratepayers' 75% portion of PTOP costs incurred by PNMGS. In accordance with the stipulation in Case No. 2183, the Commission applied the Rate Rider 8 take-or-pay surcharge to all customer classes.

{29} PNMGS has both transportation customers, who buy from PNMGS the service of transporting through PNMGS's gas pipelines natural gas purchased by the transportation customer from a different supplier, *see* NMSA 1978, § 62–6–4.1 (1993, repealed effective July 1, 2003) (providing for the contract carriage of natural gas), and sales customers, who buy natural gas directly from PNMGS. *See generally* NMSA 1978, § 62–8–4 (1941, repealed effective July 1, 2003) ("[E]very utility shall have the right to make reasonable classifications of its users"). PNMGS's transportation customers tend to be industrial or large commercial natural gas users, compared to the mainly residential and small commercial customers comprising the class of sales customers.

{30} Under the Rate Rider 8 tariff, PNMGS recovers the ratepayer portion of PTOP costs from both sales customers and on-system transportation customers, meaning those transportation customers within PNMGS's service area. Because the gas transportation market is highly competitive, however, the Commission, in Case No. 2340, adopted the hearing examiner's recommendation that PNMGS be allowed to discount the Rate Rider 8 surcharge for transportation customers in order to provide an incen-

tive to continue purchasing transportation service from PNMGS. The Commission determined that the granting of prudent Rate Rider 8 discounts would be more beneficial to PNMGS and ratepayers generally in terms of revenue and increased load than the loss of transportation customers to competitors of PNMGS. Additionally, the loss of a transportation customer and that customer's contribution to Rate Rider 8 would result in an increase of other customers' contribution to Rate Rider 8 in order to fully satisfy ratepayers' 75% contribution to recovery of take-or-pay costs. The decision to allow PNMGS to discount Rate Rider 8 surcharges for on-system transportation customers was consistent with the Commission's existing policy to allow cost-of-service discounts in negotiating on-system and off-system transportation rates provided that the discounted rate is above the variable cost of service.

{31} In Case No. 2340, the Commission noted that "it is uncontested that [PNMGS] should be allowed to recover the discounts; it is the manner of recovery that is at issue." The Commission determined that requested recovery of Rate Rider 8 discounts should be reviewed in general rate proceedings, such as the present case, and that "the Commission will treat the discounts in the same manner as discounts for transportation rates."

{32} Relying on the Commission's approval in Case No. 2340, PNMGS began granting Rate Rider 8 discounts to transportation customers in July 1992. In the present proceeding, PNMGS sought to recover actual Rate Rider 8 discounts granted from July 1992 through the end of the test period in the amount of $5,374,665.[2] PNMGS con-

---

**2.** Additionally, PNMGS sought rate recovery for Rate Rider 8 discounts that PNMGS anticipated granting to transportation customers. Although PNMGS claims on appeal that the Commission improperly excluded anticipated discounts from its review of Rate Rider 8 discounts, we believe the Commission's decision to limit its review to actual Rate Rider 8 discounts is supported by the Commission's decision in Case No. 2340, in which the Commission rejected PNMGS's proposal of immediate recovery of discounts by reallocating them through Rate Rider 8 and accepted the position of Staff and the Attorney General that such discounts should be deferred until a general rate proceeding. The Commission concluded that the stipulation in Case No. 2183 did

not contemplate the reallocation of discounts and that "the Commission can fully examine transportation discounts and determine the amount attributable to Rate Rider 8 costs and those attributable to cost of service components." The Commission's decision to exclude anticipated discounts from review in this case is therefore consistent with the Commission's determination that it must "fully examine" Rate Rider 8 discounts in order to determine whether rate recovery is just and reasonable. The Commission's decision is also supported by the testimony of the Attorney General's expert, Steven Ruback, that anticipated discounts "are highly speculative," and Staff's expert, Gary Roybal, that recovery of

tended that the Commission should review Rate Rider 8 discounts under a general prudence standard and that all of the discounts were reasonable.

{33} The hearing examiner accepted the positions of Staff and the Attorney General that Rate Rider 8 discounts should be evaluated under a cost/benefit test instead of PNMGS's proposed test of prudence. However, the hearing examiner modified the cost/benefit test on the basis of rebuttal testimony from PNMGS. Whereas Staff had determined the net benefit of Rate Rider 8 discounts to PNMGS by calculating PNMGS's total revenues from discounted transportation customers, including both on-system and off-system transportation customers, the hearing examiner accepted PNMGS's position that a net benefit should be determined by assessing revenues associated only with Rate Rider 8, meaning revenues from discounted on-system transportation customers but not revenues from off-system transportation customers. Using this analysis, the hearing examiner concluded that PNMGS should be allowed to recover $3,644,636.

{34} The Commission agreed with the hearing examiner that PNMGS's proposed recovery of Rate Rider 8 discounts should be evaluated under a cost/benefit test. However, the Commission rejected the hearing examiner's modified cost/benefit test, and applying Staff's cost/benefit model, the Commission determined that PNMGS had a negative net economic benefit of $109,032 from Rate Rider 8 discounts. Instead of allowing recovery for this amount, the Commission then determined that "we are confident that this shortfall in fact was more than made up by PNMGS in the form of discount on-system and off-system revenues received between August 1990 and April 1992." Therefore, the Commission denied any recovery for Rate Rider 8 discounts.

{35} On appeal, PNMGS claims that the Commission's use of a cost/benefit test for Rate Rider 8 discounts constitutes the retroactive application of a change in Commission practice without sufficient justification and

prior notice. PNMGS also claims that the cost/benefit test applied by the Commission is arbitrary and capricious.

{36} We first address PNMGS's contention that the Commission unreasonably departed from prior practice. As discussed above, in determining whether the Commission has engaged in improper retroactive adjudicatory rulemaking, we assess the five factors articulated in *Hobbs Gas Co.,* 115 N.M. at 682, 858 P.2d at 58. PNMGS claims that the Commission established a prudence test for Rate Rider 8 discounts in Case No. 2340 and that it relied on this test to its substantial detriment. PNMGS thus contends that under *Hobbs Gas Co.* the Commission's action was improper. We agree with the Commission, however, that this issue presents a matter of first impression for the Commission, that its treatment of Rate Rider 8 discounts is consistent with, and a logical extension of, prior Commission practice, and that any reliance on PNMGS's part on a prudence test was not reasonable under the circumstances.

{37} In Case No. 2340, the Commission clearly granted PNMGS authority to discount the Rate Rider 8 surcharge for on-system transportation customers; however, the Commission did not establish a prudence standard for the recovery of these discounts. Instead, the Commission determined that Rate Rider 8 discounts would be treated like other transportation discounts, such as cost-of-service discounts. The Commission had previously addressed transportation discounts in Phase I of Case No. 2068.

{38} With respect to potential recovery of cost-of-service transportation discounts, the Commission determined in Case No. 2068 that PNMGS would not be foreclosed from seeking recovery but, as a general matter, the utility would bear the burden of absorbing the discounted difference between a negotiated rate and a fully allocated cost-of-service rate. The Commission rejected PNMGS's contention that placing the risk of lost revenues from cost-of-service discounts on the utility would discourage the negotia-

anticipated discounts would improperly shift PTOP costs from Rate Rider 8 to base rates in

conflict with the stipulation approved in Case No. 2183.

tion of rates, because the potential loss of revenues from a loss of customers to competitors provides a "major incentive" to negotiate transportation rates. Nonetheless, the Commission determined that the allocation of costs from cost-of-service discounts "involves a variety of factors and equities that should be considered," and the Commission left open the possibility of granting recovery for cost-of-service discounts under certain limited scenarios.

{39} Based on the Commission's decision in Case No. 2068, Staff's expert, Mr. Roybal, testified that recovery of Rate Rider 8 discounts should similarly be determined based on all factors and equities associated with PNMGS's discounting procedure. Mr. Roybal testified that "embedded in [the Case No. 2068 transportation discount] framework is the consideration of the costs and benefits associated with the discount activities of a gas utility." Mr. Roybal further testified that this proceeding presented the Commission with the first request for recovery of any form of transportation discounts, and the Commission therefore had not had the opportunity to refine its remarks concerning transportation discount recovery in Case No. 2068. Staff proposed a cost/benefit test for recovery of Rate Rider 8 discounts in order to further the principles articulated in Case No. 2068 concerning transportation discounts generally.

{40} As related by Mr. Roybal's testimony, the proper standard for evaluating recovery of Rate Rider 8 discounts was a matter of first impression before the Commission. The Commission has a duty to ensure that "[n]o public utility shall, as to rates or services, make or grant any unreasonable preference or advantage to any corporation or person within any classification." NMSA 1978, § 62–8–6 (1993, repealed effective July 1, 2003). The stipulation in Case No. 2183 provided that ratepayers' portion of PTOP costs would be recovered from all customer classes. Mr. Roybal testified that recovery

for PNMGS's actual Rate Rider 8 discounts "results in an extreme inequity to the detriment of sales customers and full-tariff transportation customers." Mr. Roybal additionally testified that recovery of discounts through base rates would shift the allocation of PTOP costs contrary to the stipulation in Case No. 2183 and that doing so would improperly place "the entire risk of PNMGS discount activities ... upon sales customers and full-tariff transportation customers." The Attorney General's expert, Mr. Ruback testified that PNMGS's methodology, by holding non-discounted ratepayers responsible for 100% of Rate Rider 8 discounts, "has the effect of absolving the Company from any discount responsibility." According to Mr. Ruback, "[s]ales customers should be spared additional [PTOP] costs." An expert witness for intervenor United States Executive Agencies (USEA), Jatinder Kumar, testified that "PNMGS' proposal imposes most of the risks associated with discounts on full rate customers while PNMGS retains the benefits of discounts ... [and] provide[s] PNMGS with economic incentives to maximize profits at the expense of full rate customers."

{41} On the basis of the record in this case and the Commission's prior decisions, we believe that the Commission acted reasonably in adopting a cost/benefit test to determine whether the Rate Rider 8 discounts provided a benefit to ratepayers or, instead, only served to place an undue burden on sales customers and non-discounted transportation customers.[3] Under these circumstances, we believe the Commission's adoption of a cost/benefit test was a reasonable response "to fill a void in an unsettled area of law." *Hobbs Gas Co.*, 115 N.M. at 682, 858 P.2d at 58.

{42} The Commission clearly articulated in Case No. 2340 that recovery of Rate Rider 8 discounts was not guaranteed. Because the Commission indicated that Rate Rider 8 discounts would be treated like other trans-

---

**3.** Because the Commission determined in Case No. 2340 that PNMGS "should be allowed to recover" Rate Rider 8 discounts, compared to the determination in Case No. 2068 that the utility would generally be required to absorb cost-of-service transportation discounts absent extraor-

dinary circumstances, it was also proper for the Commission to adopt a cost/benefit test in favor of a strict reliance on the factors articulated in Case No. 2068 as had been advocated by the Attorney General.

portation discounts and because PNMGS was aware of the Commission's ruling regarding transportation discounts in Case No. 2068, we believe that PNMGS's reliance on the Commission's application of a prudence test to Rate Rider 8 discounts was unreasonable. PNMGS should have known that the Commission would scrutinize Rate Rider 8 discounts to ensure that there would be no unreasonable discrimination in rates between on-system transportation customers and sales customers through an improper shifting of responsibility for PTOP costs. Thus, we conclude that the Commission's use of a cost/benefit test to evaluate Rate Rider 8 discounts did not constitute improper retroactive adjudicative rulemaking.

{43} PNMGS's other contention regarding the Commission's decision to disallow Rate Rider 8 discounts focuses on the form of the cost/benefit test applied by the Commission. PNMGS claims that the Commission acted arbitrarily and capriciously by including off-system discounted transportation revenue as a benefit under the test. We disagree. The purpose of the cost/benefit test was to ensure that recovery of Rate Rider 8 discounts would not unduly burden non-discounted ratepayers and that the risk of discounting the Rate Rider 8 surcharge be equitably distributed between shareholders and ratepayers.

{44} In Case No. 2340, the Commission determined that Rate Rider 8 discounts should be evaluated in a general rate case in order to "fully examine transportation discounts and determine the amount attributable to Rate Rider 8 and those attributable to cost of service components." Thus, consistent with the different treatment of cost-of-service discounts in Case No. 2068, the Commission clearly intended to separate the evaluation of requested recovery of Rate Rider 8 discounts from cost-of-service discounts. As the hearing examiner in the present proceeding noted, however,

> Under PNMGS' wrongful position of guaranteed Rate Rider 8 discount recovery, those discounts would carry no risks for PNMGS. Based on this position, PNMGS determined that it was in its best interest to arbitrarily discount Rate Rider 8 costs

in their entirety before discounting costs of service rates. Therefore, the Commission cannot determine whether a discount should have been attributed to cost-of-service ... or to Rate Rider 8 costs in this proceeding as contemplated by the Commission in ... Case No. 2340.

{45} Mr. Roybal explained the reason for including off-system transportation discounts in the benefit aspect of his analysis:

> Because rates to sales customers and full-tariff transportation customers are designed to recover total fixed costs of PNMGS, it is Staff's position that the risks of PNMGS' discounting activities are placed on sales customers and full-tariff transportation customers. The benefits associated with all discount activities, including discount off-system transportation agreements, are factors to be considered and included in the analysis to determine the overall costs and benefits associated with PNMGS' discount activities.

We believe Mr. Roybal's testimony indicates a concern about PNMGS's failure to differentiate cost-of-service discounts from Rate Rider 8 discounts.

{46} With PNMGS's treatment of Rate Rider 8 discounts in relation to cost-of-service discounts in mind, the Commission's decision to include total discounted revenues is understandable. Mr. Ruback summarized the basis of the Commission's decision regarding cost-of-service discounts in Case No. 2068 as follows: "If the Company cannot recover these costs from transportation customers, because of such customers' competitive alternatives, they should not be reallocated to captive customers. This is a business risk which investors voluntarily undertake and have been compensated for." We believe the Commission was properly cautious that PNMGS may have been attempting to structure discounts in order to circumvent the recovery criteria established for cost-of-service discounts in Case No. 2068, thereby overstating Rate Rider 8 discounts and resulting in unnecessary and unreasonable shifting of PTOP costs to sales customers. Because cost-of-service discounts are available to off-system transportation customers, we cannot conclude

that it was arbitrary and capricious for the Commission to include total discounted transportation revenue in its cost/benefit test in order to ensure that recovery of transportation discounts would not unreasonably shift the risk of discounting to ratepayers.

{47} This same rationale, however, does not apply to the Commission's decision to deny recovery of its calculation of a negative net economic benefit of $109,032 based on transportation revenues earned prior to Case No. 2340. Because PNMGS did not begin granting Rate Rider 8 discounts until after Case No. 2340 and did not request rate recovery for cost-of-service discounts negotiated prior to that time, we believe that these transportation revenues are wholly unrelated to PNMGS's request to recover Rate Rider 8 discounts. Thus, although the Commission's cost/benefit test is supported by the record, we conclude that the decision to deny recovery of PNMGS's negative net economic benefit from Rate Rider 8 discounts of $109,032 on this basis was arbitrary and capricious and is not supported by substantial evidence in the record.

## B. Reservation Fees

{48} PNMGS sought a three-year amortization of $7,062,261 in reservation fees paid under two gas purchase contracts with Amoco Producing Co. and Conoco, Inc. PNMGS entered into these gas purchase contracts as part of its settlement of price dispute litigation with Amoco and Conoco concerning take-or-pay clauses. As stated by PNMGS's witness, Mr. Christopher, a reservation fee "represents the cost to the supplier for reserving gas supplies for the purchaser" and is separate from, and significantly less costly than, the market value of the commodity. A reservation fee is intended to guarantee an adequate supply of gas for peak demands with lower cost supplies.

{49} In seeking rate recovery of the reservation fees, PNMGS introduced a significant amount of expert testimony that the fees were reasonably and prudently incurred. For example, Mr. Christopher testified that, at the time PNMGS reached an agreement with Amoco and Conoco concerning the res-

ervation of gas, there was a long-term projection of rising demand accompanied by rising prices, prompting PNMGS to seek long-term contracts; however, because prices had reached record lows, producers were reticent to enter into long-term contracts, thereby creating a difficult negotiating environment for PNMGS. Additionally, the contract price of the reservation fees, according to Mr. Christopher, was competitive with bids from similarly situated producers having large reserves for the reservation of winter supplies. Mr. Christopher also testified that the reservation contracts with Amoco and Conoco allowed PNMGS to negotiate more favorable agreements with other producers.

{50} Staff and the Attorney General opposed recovery of the reservation fees. Staff's expert, Mr. Roybal, and the Attorney General's expert, Mr. Ruback, testified that, although reservation fees are commonly included in gas purchase contracts and it is difficult to determine the reasonableness of reservation fees, PNMGS's reservation fees under the Amoco and Conoco contracts were unreasonable and excessive. Mr. Ruback testified that the price of reserved gas under the Amoco and Conoco contracts greatly exceeded prices in other gas purchase contracts at that time and exceeded prices to which PNMGS had agreed in other contracts. Mr. Ruback concluded that "sufficient gas was available [at the time of the agreement with Amoco and Conoco] so that the Company should not have paid such a high premium for a 3–year contract as opposed to a one or two year contract."

{51} According to Mr. Roybal and Mr. Ruback, PNMGS agreed to pay excessive reservation fees to Amoco and Conoco because they served as additional consideration in the settlement of the gas purchase contract disputes involving take-or-pay issues. Mr. Ruback testified that "these excessive reservation fees are 'residual TOP costs.' At some time the Company must have made the decision that reservation fees would likely be passed through 100% to ratepayers via the PGAC, but if classified as TOP costs, at least 25% would be absorbed by the Company." In other words, Staff and the Attorney General took the position that PNMGS attempt-

ed to disguise its PTOP costs as reservation fees in order to circumvent the cost sharing methodology contained in the approved stipulation in Case No. 2183. Thus, Staff and the Attorney General argued that these costs should not be included in PNMGS's revenue requirement.

{52} The hearing examiner noted that PNMGS offered at one time to settle the dispute with Amoco and Conoco without any provision for reservation fees. Based on this fact and the testimony of Mr. Ruback and Mr. Roybal, the hearing examiner concluded that

> [t]he evidence presented in this case is clear. PNMGS has not met its burden of proving by a preponderance of evidence that the reservation fees were just, reasonable and prudently incurred.... The reservation fees were an integral part of PNMGS' settlement of PTOP disputes and carried value in the settlement of those disputes.

The hearing examiner recommended against allowing rate recovery of the reservation fees in the present proceeding but did not indicate whether PNMGS should be allowed to seek recovery of the fees as PTOP costs in a separate proceeding under the cost sharing methodology of Case No. 2183.

{53} The Commission agreed with the hearing examiner that the reservation fees were not reasonably and prudently incurred. Additionally, the Commission clarified the ambiguity concerning any future attempt to recover the reservation fees as PTOP costs. First, although Case No. 2508, in which PNMGS sought alternative recovery of the reservation fees as a cost of gas, was still pending at the time of the Commission's final order in the instant proceeding, the Commission adopted as part of its final order the hearing examiner's recommendation in Case No. 2508 that the reservation fees are not a cost of gas and consequently not recoverable through PNMGS's purchased gas adjustment clause (PGAC), see *Hobbs Gas Co.,* 115 N.M. at 679, 858 P.2d at 55 (discussing the purpose of a PGAC). Thus, the Commission found that the reservation fees could only be recovered in a general rate proceeding, such as the present case, or as PTOP costs through

Rate Rider 8. Second, the Commission determined that because the reservation fees were not prudently incurred they "cannot be recovered in base rates in this case." Finally, the Commission determined "that PNMGS is foreclosed from seeking ... recovery" of the reservation fees as PTOP costs in a separate proceeding. The Commission concluded that PNMGS settled its recovery of PTOP costs associated with the litigation between Amoco and Conoco through a stipulation in Case No. 2503/2521 and that the Commission would not alter that stipulation by allowing Rate Rider 8 recovery of reservation fees.

{54} On appeal, PNMGS claims that the Commission's determination that its reservation fees were not prudently incurred is not supported by substantial evidence in the record. Alternatively, PNMGS claims that the Commission's decision to foreclose Rate Rider 8 recovery of the reservation fees was arbitrary and capricious. We will address each of these contentions in turn.

{55} With respect to the issue of prudence, we believe PNMGS misperceives the applicable standard of review. PNMGS attempts to buttress its argument by discussing the amount of evidence it introduced before the Commission to show that the reservation fees were prudently incurred. However, we do not question whether substantial evidence supports an alternative conclusion; instead, we must determine whether substantial evidence supports the conclusion reached by the Commission. As discussed above, Staff and the Attorney General introduced expert testimony explaining the basis for their position that the reservation fees were excessive and unreasonable. While PNMGS contends that this evidence improperly relies on hindsight review rather than assessing the circumstances known by PNMGS at the time of its agreements with Amoco and Conoco, we must review the whole record in a light most favorable to upholding the decision of the Commission. We do not believe that PNMGS's evidence renders the expert testimony of Mr. Ruback and Mr. Roybal unworthy of belief or otherwise incredible. *See Otero County Elec. Coop. v. New Mexico Pub. Serv. Comm'n,* 108 N.M. 462, 465–66, 774 P.2d 1050, 1053–54

(1989) ("While we review any evidence that supported [the utility's] position, we use that evidence only to test the credibility of evidence supporting the Commission's decision and reject that decision only if the evidence in support of that decision was rendered incredible."). Thus, we conclude that the Commission's determination that the reservation fees were imprudent is supported by substantial evidence in the record.

{56} Nonetheless, we agree with PNMGS that the Commission acted arbitrarily and capriciously by denying PNMGS the opportunity to recover the reservation fees as PTOP costs in a separate proceeding. In order to explain our decision on this issue, it is necessary to more closely scrutinize the stipulation reached in Case No. 2503/2521. In that proceeding, PNMGS did not initially request recovery for the reservation fees in its petition to recover the PTOP costs associated with its litigation with Amoco and Conoco. Although PNMGS attempted to inject the issue of reservation fees in Case No. 2503/2521 in its rebuttal testimony, it voluntarily withdrew this issue following objections by other parties that it exceeded the scope of rebuttal. Thus, at the time the parties agreed to the stipulation, the issue of reservation fees was not an outstanding issue in Case No. 2503/2521.

{57} The stipulation in Case No. 2503/2521 explicitly provided: "A final order issued by the Commission approving this Stipulation shall not constitute a bar to any future litigation of issues raised in the pleadings and testimony or any issues which could have been raised or any other matters which have not been addressed specifically by this Stipulation." The stipulation contained no explicit provision dealing with reservation fees. It is clear from the terms of the stipulation that it resolved the recoverable amount of PTOP costs initially requested by PNMGS in that case and, as the hearing examiner noted, did not resolve the issue of reservation fees. Thus, no party to the stipulation could have reasonably believed that the stipulation would bar future litigation of the reservation fee issue.

{58} Based on our review of the stipulation in Case No. 2503/2521, we conclude that the Commission's concern about altering the stipulation in that case by permitting PNMGS to seek Rate Rider 8 recovery of the reservation fees is unfounded. The Commission has a statutory duty to balance the interests of investors and ratepayers in a neutral manner. *See* § 62–3–1(B). Based on Staff's and the Attorney General's position that the reservation fees were disguised PTOP costs, based on the Commission's application of its previously established cost-sharing methodology to the other PTOP costs associated with PNMGS's litigation with Amoco and Conoco, and based on the Commission's determination that recovery of the reservation fees was limited to either a general rate proceeding or Rate Rider 8, we conclude that the Commission's decision in this proceeding to deny rate recovery *and* to preclude PNMGS from the opportunity of seeking future recovery of reservation fees as PTOP costs was arbitrary and capricious.

## C. Mewbourne Settlement

{59} PNMGS had two gas purchase contracts with Mewbourne, a gas well operator, that were labeled GP 11560 and GP16368. Both of these contracts contained take-or-pay clauses. PNMGS introduced expert testimony that both of these contracts were reasonable and prudent.

{60} In 1993, Mewbourne filed two claims against PNMGS for breach of contract, alleging that PNMGS failed to take or pay for certain quantities of gas. Mewbourne claimed take-or-pay deficiencies, with prejudgment interest, in excess of $2 million between the two claims. PNMGS filed two counterclaims against Mewbourne relating to refunds for alleged overpayment of gas and to a natural gas compression agreement. After performing a risk analysis of Mewbourne's claims, in conjunction with a consulting firm, and estimating litigation expenses if the case were to go to trial, PNMGS engaged in extended negotiations and eventually agreed to settle the claim with Mewbourne in June of 1995. Pursuant to the settlement, PNMGS agreed to pay Mewbourne $457,000 as full and complete settlement of Mewbourne's take-or-pay claims, and Mewbourne agreed to pay PNMGS $197,000 as full and

complete settlement of PNMGS's counterclaims.

{61}   In this proceeding, PNMGS sought to recover PTOP costs associated with its settlement of litigation with Mewbourne. Specifically, PNMGS sought rate recovery of the settlement amount of $457,000 and litigation expenses of $204,957.43.   PNMGS proposed to credit its settlement proceeds of $197,000 to its PGAC. In addition to its expert testimony concerning the prudence of the gas purchase contracts with Mewbourne, PNMGS introduced the testimony of two witnesses that the requested litigation expenses associated with Mewbourne's claims were necessary and reasonable.

{62}   Based on a Commission rule requiring utilities to immediately credit a PGAC with refunds from gas suppliers, the Commission adopted the hearing examiner's recommendation that the proceeds received by PNMGS from the Mewbourne settlement immediately be credited to the PGAC. The Commission also allowed rate recovery of a portion of PNMGS's litigation expenses, $61,737.94, incurred in association with PNMGS's successful settlement of its counterclaims against Mewbourne.   The Commission then determined that PNMGS imprudently extended the take-or-pay clause in gas purchase contract GP 11560 with Mewbourne in 1985 for an additional five years.  The Commission further determined that PNMGS was imprudent in not relieving itself of the take-or-pay obligation in its management of GP 16368.  As a result, the Commission determined that shareholders, rather than ratepayers, should bear the burden of PNMGS's failure to relieve itself of take-or-pay obligations with Mewbourne.  Because the Commission determined that the take-or-pay clauses were imprudent, it also denied the remaining litigation expenses of $143,219.49.  On appeal, PNMGS claims that the Commission's determination that its PTOP costs were imprudently incurred is unsupported by substantial evidence.[4]

{63}   We separately evaluate the Commission's determination of imprudence for each contract with Mewbourne.  The Commission has previously defined prudence in this context as the standard of care expected of a reasonable person acting under the circumstances faced by a utility's management at the time of the decision at issue.   The Commission considers only those facts known or knowable by a utility at the time of the decision, and it eschews any form of hindsight review.

{64}   Staff's expert, Estevan Lopez, testified that it was imprudent for PNMGS to extend GP 11560 with Mewbourne in 1985. According to Mr. Lopez, "PNMGS' decision to extend GP 11560 needlessly exposed it to unwarranted risk of future added costs with little, if any, benefit expected in return for that exposure."  PNMGS attempted to counter this evidence.  However, we do not believe that PNMGS's rebuttal renders Mr. Lopez's contrary opinion incredible.  *See Attorney Gen.*, 101 N.M. at 553, 685 P.2d at 961 ("Although conflicting testimony was presented to the Commission, evidence of two conflicting opinions in the record does not mean that the decision arrived at is unsupported by substantial evidence."); *see also Las Cruces Prof'l Fire Fighters & Int'l Ass'n of Fire Fighters, Local 2362 v. City of Las Cruces,* 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177.  Thus, we conclude that the Commission's determination that PNMGS was imprudent in extending the take-or-pay clause in GP 11560 is supported by substantial evidence.

{65}   We reach a different conclusion, however, with respect to the Commission's determination of imprudence for the take-or-pay clause in GP 16368.  Unlike GP 11560, Staff did not oppose recovery for PTOP costs associated with GP 16368. Staff's witness, Mr. Lopez, did not oppose such recovery on the basis that PNMGS's predecessor, Southern Union Gas Co., executed the contract with Mewbourne and the

---

**4.** We reject PNMGS's claim that the Commission improperly gave separate treatment to its proceeds and expenses from the settlement with Mewbourne.  PNMGS received its proceeds as settlement for its counterclaims against Mewbourne, and these counterclaims involved issues entirely distinct from PTOP costs.  The Commission acted well within its discretion in ascertaining the source of PNMGS's settlement proceeds and treating them accordingly.

contract was assigned to PNMGS upon its acquisition of Southern Union. According to Mr. Lopez, "PNMGS did not make the decision to extend this particular contract and its shareholders should not be expected to bear the cost which resulted from that decision."

{66} The Commission apparently accepted the proposition that because PNMGS was not involved in signing the contract it could not be held responsible for the existence of the take-or-pay clause. Additionally, the Commission concluded, on the basis of the protracted and complex history of PNMGS's acquisition of Southern Union, that it was not imprudent for PNMGS to accept GP 16368 as a part of the acquisition. Nonetheless, the Commission concluded that "PNMGS had the opportunity after the acquisition to renegotiate the contract or manage its purchases or both." This conclusion is without support in the record. In fact, the only testimony concerning the prudence of GP 16368 came from Mr. McFearin, who testified that Southern Union acted prudently in entering into the contract with Mewbourne. There was no testimony that PNMGS had an opportunity to renegotiate GP 16368 with Mewbourne or what costs PNMGS would have reasonably incurred in the process of such a renegotiation. Thus, the Commission's determination of imprudence concerning PNMGS's failure to manage properly its contract with Mewbourne is based solely on conjecture. As a result, we conclude that the Commission's decision to disallow PNMGS's PTOP costs associated with GP 16368 is unsupported by substantial evidence. For the same reason, the Commission improperly denied the portion of PNMGS's requested litigation expenses related to its settlement of GP 16368.[5]

### V. Rate Case Expenses

{67} PNMGS sought recovery of $925,845 in rate case expenses. PNMGS obtained this figure by estimating its total expenses for consulting costs and for external and internal legal costs incurred in litigating the present rate case. The hearing examiner recommended full recovery of rate case expenses through a three-year amortization. However, the Commission rejected the hearing examiner's recommendation and denied all recovery of rate case expenses. PNMGS contends on appeal that the Commission's decision is not supported by substantial evidence and is an unjustified departure from prior Commission practice.

{68} In establishing a revenue requirement for a utility, the Commission determines a utility's test-year costs of operation. *See Hobbs Gas Co.*, 94 N.M. at 733, 616 P.2d at 1118. "[T]he Commission has an obligation to allow a utility expenses that are necessary in providing utility service, that benefit ratepayers, and that are prudently incurred." *Zia Natural Gas*, 2000–NMSC–011, ¶ 13, 128 N.M. 728, 998 P.2d 564. Because rate proceedings are a part of the normal course of business for a utility and because rate proceedings, by establishing just and reasonable rates, are conducted for the benefit of both ratepayers and shareholders, it is widely accepted that rate case expenses are one aspect of a utility's operating costs and are recoverable in a general rate proceeding. *Driscoll v. Edison Light & Power Co.*, 307 U.S. 104, 120–21, 59 S.Ct. 715, 83 L.Ed. 1134 (1939) ("Even where the rates in effect are excessive, on a proceeding by a commission to determine reasonableness, we are of the view that the utility should be allowed its fair and proper expenses for presenting its side to the commission."); *Du Page Util. Co. v. Illinois Commerce Comm'n*, 47 Ill.2d 550, 267 N.E.2d 662, 668 (1971); *Butler Township Water Co. v. Pennsylvania Pub. Util. Comm'n*, 81 Pa.Cmwlth. 40, 473 A.2d 219, 221 (1984). As a result, the Commission typically allows rate recovery for prudently incurred rate case expenses. *Cf. Maine Water Co. v. Public Utils. Comm'n*, 482 A.2d 443, 453 (Me.1984) ("The allowance for ratemaking purposes of rate case expenses depends . . . upon whether those expenses were prudently incurred.").

---

**5.** Our decision on this issue should not be interpreted as expressing any view concerning the portion of PTOP costs from GP 16368 to which PNMGS is entitled or the extent to which the Commission's cost-sharing methodology for PTOP costs from Case No. 2183 should be applied to the PTOP costs involved in this case.

{69} In this case, PNMGS's evidence of rate case expenses, an estimate of expenses based on an overall cost budget minus in-house legal expenses, mirrored the evidence PNMGS has introduced in prior litigated rate proceedings before the Commission. Additionally, PNMGS introduced testimony concerning the utility's efforts to minimize attorney's fees. Neither the Attorney General nor Staff objected to recovery of rate case expenses or to the reasonableness of PNMGS's estimate.

{70} The Commission denied all recovery of rate case expenses based on its claim of a changed circumstance justifying departure from prior Commission practice. The Commission contends that it was bound by a change in the law. In 1993, the Legislature enacted the following statute: "In any commission rate proceeding in which the utility seeks rates to recover adjusted test-year litigation expenses there shall be no presumption that the litigation expenses are prudent." NMSA 1978, § 62-13-3(B) (1993, repealed effective July 1, 2003). The Commission contends that Section 62-13-3(B) altered the burden of proof previously utilized for rate case expenses.[6]

{71} In reviewing the Commission's construction of a provision in the Public Utility Act, we

begin by according some deference to the agency's interpretation. The [C]ourt will confer a heightened degree of deference to legal questions that implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function. However, the [C]ourt is not bound by the agency's interpretation and may substitute its own independent judgment for that of the agency because it is the function of the courts to interpret the law.

*Morningstar Water Users Ass'n v. New Mexico Pub. Util. Comm'n*, 120 N.M. 579, 583, 904 P.2d 28, 32 (1995) (citations and internal quotation marks and quoted authority omitted).

{72} Generally speaking, when a utility petitions the Commission for an increase in rates, "the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the utility." NMSA 1978, § 62-8-7(A) (1991, prior to 1998 amendment, repealed effective July 1, 2003). The Commission has interpreted this provision to require that utilities demonstrate that a proposed revenue requirement or a proposed rate is just and reasonable. *See Otero County Elec. Coop.*, 108 N.M. at 464-65, 774 P.2d at 1052-53 (discussing Section 62-8-7(A)). However, the Commission has applied a different standard with respect to individual operating costs, including rate case expenses.

Presumption as used by the commission means a general disposition by the commission to view expenses incurred as reasonable. In a rate case ... it would be burdensome to require a utility to justify every expenditure which is the basis of the request for rate relief. Therefore, unless an expense is challenged, the commission assumes it was reasonably incurred.

*Public Serv. Co.*, 50 Pub. Util. Rep. 4th (PUR) 416, 427 (N.M. Pub. Util. Comm'n 1982); *see Attorney Gen.*, 101 N.M. at 552, 685 P.2d at 960 ("The normal burden to be met in making a *prima facie* case regarding costs incurred ... is a demonstration that the costs were, in fact, incurred.").

{73} We presume that the Legislature was aware of existing law, including the Commission's rules, at the time it enacted Section 62-13-3(B). *See State ex rel. Human Servs. Dep't (In re Kira M.)*, 118 N.M. 563, 569, 883 P.2d 149, 155 (1994). Thus, given the Commission's prior holding regarding a presumption of reasonableness for operating costs actually incurred by a utility and our discussion in *Attorney General* regarding the difference between the "normal burden" of demonstrating that costs were incurred and the heightened burden of demonstrating the reasonableness of individual costs, 101 N.M. at 552, 685 P.2d at 960, we agree with the Commission that the Legislature intended to effect a change in policy

---

**6.** Although the Legislature had previously addressed the general issue of costs in Section 62-13-3(A), *see* 1983 N.M. Laws ch. 250, § 6; 1941 N.M. Laws ch. 84, § 82, the Legislature had not addressed litigation expenses prior to the 1993 enactment of Section 62-13-3.

with respect to litigation expenses by enacting Section 62–13–3(B). *But cf. Millinocket Water Co. v. Maine Pub. Utils. Comm'n,* 515 A.2d 749, 753 (Me.1986) (concluding that a newly promulgated Commission rule requiring a utility to allocate rate case expenses by issue merely restated requirement of demonstrating prudence of rate case expenses and did not create a new rule for purposes of due process). We also agree with the Commission that the existence of this statute provided adequate notice to PNMGS of a change in circumstances. Therefore, we agree with the Commission that PNMGS, by presenting only a budget-based estimate with no itemization of costs or evidence of reasonableness, failed to carry its burden of proving that its requested rate case expense of $925,845 was reasonable and prudent.

■ {74} Nevertheless, we do not believe that the Legislature, by enacting Section 62–13–3(B), intended that the Commission ignore the reality of the situation before it. The Commission relied on Section 62–13–3(B) to disapprove of the use of an estimate for rate case expenses. We do not accept this application of Section 62–13–3(B). Although we agree that PNMGS did not introduce sufficient evidence that its entire estimate of $925,845 was reasonable and prudent, we believe, based on the nature of a general rate proceeding, that it was appropriate and reasonable for PNMGS to continue its prior practice of relying on an estimate of rate case expenses.

{75} A utility incurs ongoing rate case expenses throughout a general rate proceeding, from the pre-filing of testimony through the filing of exceptions to a hearing examiner's recommended decision. Because rate case expenses form a part of a utility's operating costs, a utility typically provides an estimate of rate case expenses in order to avoid the constant adjustments in the proposed revenue requirement that a showing of

actual rate case expenses would necessarily entail. We do not believe that the Legislature, merely by removing the presumption of reasonableness with respect to litigation expenses, intended to preclude the pragmatic practice of estimating rate case expenses. Instead, we believe that the Legislature intended that utilities demonstrate the reasonableness of rate case expenses, whether estimated or actual.[7] Therefore, we reject the Commission's reliance on Section 62–13–3(B) as sufficient justification for departing from prior Commission practice in disallowing PNMGS's use of an estimate for requesting rate case expenses.

{76} Further, while PNMGS did not itemize its estimate or identify the amount of the estimate that applied to outside legal representation, PNMGS nonetheless satisfied its burden of proof regarding the reasonableness of attorney's fees generally through the testimony of its witness, Ramon Gonzales, and no party introduced any evidence in this case suggesting that PNMGS's attorney's fees were not prudently incurred. Thus, we believe it was unreasonable for the Commission to disregard the fact that PNMGS's overall estimate included reasonable and prudent costs for outside legal representation. Additionally, it is unquestionable that in a proceeding of this magnitude PNMGS reasonably and prudently incurred substantial costs for consulting fees and other expenses involved in litigating this rate proceeding. Even if PNMGS failed to demonstrate that its overall estimate was reasonable and prudent, it is clear from the record that PNMGS prudently incurred considerable rate case expenses in this proceeding.

■ {77} While the Commission was appropriately circumspect about PNMGS's overall estimate, we believe that the Commission's denial of rate case expenses in their entirety was arbitrary and capricious. When confronted with a questionable estimate of

7. Of course, we do not intend to prevent the Commission from relying on evidence of actual rate case expenses to find that a utility's estimate is unreasonably high. For example, in Case No. 2147, the Commission relied on evidence of actual costs for an expert witness fee introduced by the Attorney General to reduce PNMGS's estimated rate case expenses from $500,000 to

$350,000. *Cf. City of El Paso v. Public Util. Comm'n,* 916 S.W.2d 515, 526 (Tex.App.1995) (dismissed by agreement of the parties; judgment, but not opinion, withdrawn) ("The law does not require the Commission to accept the [petitioner's] conclusion of what is reasonable and award it an amount in excess of actual costs.").

rate case expenses on one hand and irrefutable evidence that a utility has prudently incurred substantial, if unquantified, rate case expenses on the other, the Commission cannot simply deny recovery altogether; the Commission instead must determine the amount of reasonable and prudent rate case expenses incurred by the utility. We conclude that it was unreasonable and without support in the record for the Commission to determine that PNMGS incurred no reasonable rate case expenses in this proceeding. *Cf. Butler*, 473 A.2d at 221 ("The declaration of a policy based on general conclusions may not be substituted for an evaluation of the evidence in each case."). On remand, we believe that the Commission must assess PNMGS's estimate and determine a prudent amount of rate case expenses.[8]

## VI. Weather Normalization

{78} Natural gas usage is heavily dependent on weather, with higher usage occurring during colder weather. Because ratemaking is prospective in nature, the Commission, in an attempt to accurately predict a natural gas utility's revenue requirement based on past activity, utilizes a weather normalization adjustment to minimize the potentially distorting effect of unusually high- or low-usage test years. The weather normalization adjustment consists of an average weather calculation based on long-term weather data.

{79} PNMGS proposed a weather normalization adjustment based on ten years of weather data that covered the Albuquerque area and twenty-one other locations in PNMGS's service territory. Staff supported PNMGS's weather normalization adjustment. The Attorney General, however, argued against adopting PNMGS's weather normalization adjustment and instead proposed an adjustment based on thirty years of weather data for only the Albuquerque area. According to the Commission, "[b]ecause the base period for this case was warmer than normal, PNMGS's adjustment would have the effect of increasing base period net operating income by \$3,956,231. The Attorney General's thirty-year adjustment would reduce PNMGS's proposed revenue requirement by an additional \$3.7 million." (Footnote omitted.) PNMGS contended that a ten-year adjustment provides greater predictability of normal weather and annual revenue requirements. In fact, PNMGS had switched to a ten-year adjustment for internal and external financial forecasting, and the stipulation in PNMGS's last rate case employed a ten-year adjustment. Additionally, PNMGS contended that the Attorney General's thirty-year adjustment was improper because it was limited to the Albuquerque area, which is responsible for only 50% of PNMGS's total load.

{80} The hearing examiner recommended that the Commission accept PNMGS's proposed ten-year adjustment because an analysis of actual residential usage during the ten-year period revealed that PNMGS's proposal was "closer than the [Attorney General's] thirty-year method on an annual average basis for the period studied." However, the hearing examiner noted that a

8. The Commission may utilize its own expertise and experience with amounts of rate case expenses typically incurred by a utility in a comparable rate case proceeding. *See Popowsky v. Pennsylvania Pub. Util. Comm'n*, 674 A.2d 1149, 1153–54 (Pa.Cmwlth.1996) (stating that a utility bears the burden of proving that rate case expenses are just and reasonable and upholding the Commission's decision to reduce an unreasonably high estimate to the amount of actual costs incurred by the utility in a prior proceeding); *cf. Calderon v. Navarette*, 111 N.M. 1, 3, 800 P.2d 1058, 1060 (1990) (stating that a court may rely on "its own knowledge and expertise regarding the nature of the services rendered by [an attorney] to calculate the value of the [attorney's] fee"). *Compare* N.M. Pub. Util. Comm'n Case No. 2147 (allowing recovery of \$350,000 in a litigated rate proceeding), *with Public Serv. Co.*, 111 Pub. Util. Rep. 4th (PUR) 313, 376–77, 1990 WL 488711 (allowing recovery of \$1,284,918 in regulatory expenses for the rate proceeding at issue, as well as regulatory expenses from other proceedings). Alternatively, the Commission may order PNMGS and other parties to supplement the record with evidence of actual costs or the reasonableness of PNMGS's estimate. *See* Commission Decisions & Orders, Exceptions, Rehearings, Reopening Proceedings, 17 NMAC 1.2.39.5.4 (Dec. 31, 1998) ("The Commission on its own motion may at any time reopen any proceeding when it has reason to believe that conditions of fact or law have so changed as to require, or that the public interest requires, the reopening of such proceeding.").

thirty-year data set "provides a greater number of data points to level out high points and low points for normalization purposes." The Commission adopted the Attorney General's thirty-year adjustment because it concluded that a longer period utilized for adjustment "will tend to better capture the variability of the weather."

{81} PNMGS now contends that the Commission's decision lacks substantial evidence in the record. We disagree. In previous litigated rate cases, the Commission has utilized a thirty-year weather normalization adjustment based on data from numerous locations throughout PNMGS's service territory. The Attorney General's expert, Mr. Cotton, testified that a thirty-year adjustment "more appropriately reflects recent and short-term weather conditions." In addition, Mr. Cotton testified that the application of a consistent weather normalization adjustment over time provides a utility with the greatest opportunity to earn a fair and reasonable rate of return. However, Mr. Cotton testified that there was no available thirty-year weather data in this case other than data for the Albuquerque area. Thus, the Commission was presented with two deficient data sets; PNMGS's proposal was limited to a shorter period of time, while the Attorney General's proposal was limited to a smaller portion of PNMGS's service territory.

{82} We believe it was in the Commission's discretion to decide that the Attorney General's proposal would provide a more accurate representation of PNMGS's revenue requirement. Mr. Cotton testified that "the Albuquerque data serves as a reasonable proxy" for PNMGS's entire service area. The fact that PNMGS introduced expert testimony supporting an alternative view is not dispositive. *See Attorney Gen.,* 101 N.M. at 553, 685 P.2d at 961. While PNMGS's analysis raised some concerns about the Attorney General's proposal, it did not render the position of the Attorney General's expert incredible. We again emphasize the narrow scope of our review. "The question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Prof'l Fire Fighters,* 1997–NMCA–

044, ¶ 12, 123 N.M. 329, 940 P.2d 177. As the hearing examiner noted, "[s]ince both proposals raise concerns, the Commission must determine which will more accurately set PNMGS' revenue level." Viewing the evidence in the whole record in a light most favorable to the Commission's decision, we conclude that there is substantial evidence to support the Commission's use of the thirty-year weather normalization adjustment advanced by the Attorney General. *Cf. National Fuel Gas Distribution Corp. v. Pennsylvania Pub. Util. Comm'n,* 677 A.2d 861, 863 (Pa.Cmwlth.1996) (concluding that substantial evidence supported the utility commission's decision to utilize a thirty-year weather normalization adjustment instead of the ten-year adjustment proposed by the utility).

## VII. Rate of Return

{83} PNMGS proposed a rate of return of 9.93% based on its calculation of the weighted cost of capital. For its proposal of the weighted cost of capital, meaning the weighted average of the cost of long-term debt, the cost of preferred stock, and the cost of common equity, PNMGS relied on data available at the time it filed its case in chief on August 28, 1995. On January 16, 1996, Staff filed a proposal for a rate of return of 9.17% that was based on financial data that became available on December 15, 1995. The Commission accepted the hearing examiner's recommendation to adopt Staff's proposed rate of return of 9.17%. PNMGS now contends on appeal that the Commission's conclusion on this issue is contrary to decisions of this Court in other rate cases because it was not based on the most current data available to the Commission.

{84} In contrast to the proposals regarding capital structure, cost of debt, and cost of preferred stock, the difference between Staff's and PNMGS's proposed cost of equity went beyond changes in market data. PNMGS's expert, Dr. Moyer, derived his 12.2% cost of equity by averaging two separate discounted cash flow (DCF) model estimates with two separate capital asset pricing model (CAPM) estimates and an estimate of the average comparable earnings of the eight

comparison natural gas distribution companies. Staff's expert, Mr. Brack, similarly averaged two DCF model cost of equity estimates, using a dividend yield plus growth DCF model that Staff had also used in prior rate cases, but Mr. Brack's proposal did not include CAPM or comparable earnings estimates.

{85} On cross-examination concerning the cost of equity proposal, Mr. Brack testified that, generally speaking, the cost of equity for utilities will be higher when interest rates are higher. Mr. Brack also testified that the interest rate for long-term government bonds was 6.64% at the time of PNMGS's proposal, 6.03% at the time of Staff's proposal, and 6.98% at the time of the hearing. Finally, Mr. Brack testified that the fluctuating interest rate would have an impact on a portion of the difference between PNMGS's proposed 12.2% cost of equity and Staff's proposed 11.00% cost of equity.

{86} On appeal, PNMGS contends that the Commission erred by overlooking Mr. Brack's testimony about recent changes in interest rates. PNMGS contends that Mr. Brack's testimony indicates that Staff's proposed rate of return was unreasonably low due to "a temporary dip in interest rates that had more than reversed itself by the time of the hearing." PNMGS, relying on precedent of this Court, claims that the Commission was bound to use the interest rates prevailing at the time of the hearing. Thus, PNMGS contends that the Commission erroneously adopted Staff's proposed rate of return of 9.17%.

{87} As PNMGS notes, this Court has previously stated that "[c]ommon sense requires that the latest available economic information should be utilized in order to insure that the projected figures bear a meaningful relation to future as well as past and present fiscal realities." *Mountain States*, 90 N.M. at 340, 563 P.2d at 603 (citations omitted). However, we disagree with PNMGS that our holding in *Mountain States* applies to the facts of this case. The DCF model is a mathematical formula that includes a number of variables, the determination of some of which has been described as "highly complex." Phillips, *supra*, at 376–

77. In fact, Dr. Moyer described the DCF model as dependent on some subjective factors that require a certain amount of judgment on the part of an expert. With respect to the specific testimony highlighted by PNMGS, Mr. Brack testified that, although fluctuating interest rates have an impact, the cost of common equity is also dependent on "the pricings the stocks were being traded at at the time and dividends that were being given by the different companies in our comparable group." Indeed, PNMGS's own question of Mr. Brack limited the relationship of interest rates only to "a portion of the difference" between the two parties' cost of common equity proposals. Further, PNMGS introduced no current data beyond long-term interest rates. On rebuttal, PNMGS made no attempt to recalculate its proposed rate of return by utilizing the most current financial data available, and PNMGS failed to introduce any evidence that more recent data would produce a different rate of return using Staff's cost of equity analysis. PNMGS also failed to elicit on cross-examination, and introduced no evidence in its rebuttal testimony, whether a fluctuating interest rate or other recent financial data would affect Staff's analysis of the proper hypothetical capital structure, the cost of debt, or the cost of preferred stock. Thus, Staff's and PNMGS's original proposed rates of return represent the only complete analyses of financial data introduced in this proceeding.

{88} Based on our review of the record, we believe the Commission simply lacked enough evidence of data more recent than that utilized by Staff to reformulate the proposals of Staff and PNMGS concerning the weighted cost of capital. The Commission, instead, relied on the most current comprehensive data analysis introduced by the parties. The hearing examiner found that PNMGS's proposed cost of equity represented "an optimal return" and was therefore inappropriate for ratemaking purposes. The hearing examiner concluded that Staff's proposed cost of common equity was fair and reasonable and relied on Staff's proposed capital structure, cost of debt, and cost of preferred stock because they were based on the most recent financial data in evidence.

We believe that the Commission acted well within its discretion in accepting the hearing examiner's recommendation to utilize Staff's data for PNMGS's cost of capital and capital structure and to adopt Staff's proposed rate of return. PNMGS's contention that the Commission should have utilized the evidence of an increase in interest rates at the time of the hearing would have required speculation on the part of the Commission. Thus, we reject PNMGS's argument that the Commission improperly established a rate of return of 9.17%, and we hold that the Commission did not contravene this Court's opinion in *Mountain States*. Nonetheless, we trust that the Commission will, in accordance with our directive in *Mountain States*, attempt to rely on the most recent data available on remand.

### VIII. Rate Structure

{89} Once the Commission determines a utility's revenue requirement, including a reasonable rate of return, it establishes a rate structure that provides the utility a reasonable opportunity to recover its revenue requirement and that fairly distributes just and reasonable rates between different classes of ratepayers. *See Mountain States*, 90 N.M. at 333, 563 P.2d at 596 ("[T]raditionally and logically there is a great measure of public policy that enters into the apportionment of rates."). *See generally* Phillips, *supra*, at 409–11. We have previously determined that "the [L]egislature intended utilities to bear the burden of proof for inquiries about their rate structure." *Otero County Elec. Coop.*, 108 N.M. at 465, 774 P.2d at 1053. Further, the Commission "is not required to rely on any

one rate-design method." *Attorney Gen. v. New Mexico State Corp. Comm'n (In re Rates & Charges of U.S. West Communications, Inc.)*, 121 N.M. 156, 165, 909 P.2d 716, 725 (1995). "Extreme nicety in the allocation is not required, but only reasonable measures are necessary." *Mountain States*, 90 N.M. at 339, 563 P.2d at 602. PNMGS and the Attorney General appeal two different aspects of the Commission's rate structure in this case.

### A. Rate Rider 12

{90} PNMGS incurs a normal operating expense known as reliability costs, which a PNMGS expert defined as "those costs which are incurred by PNMGS in the course of acquiring and delivering gas supplies to its system for the purpose of meeting the swing and peak winter requirements of the end users on its system." Reliability costs include reservation fees, premium prices for peak period gas supplies, facility costs associated with peak demands, and demand charges paid to interstate pipelines. As mentioned above, PNMGS has both transportation customers and sales customers. Under the rate structure existing at the time PNMGS petitioned for an increase in rates, PNMGS collected reliability costs only from sales customers, either through PNMGS's PGAC or, for facility-related reliability costs, in the rate base. PNMGS sought to modify the rate structure to allocate reliability costs between transportation and sales customers.[9] Specifically, PNMGS proposed to recover reliability costs through a reliability volumetric surcharge labeled Rate Rider 12.

**9.** According to PNMGS's expert witnesses, PNMGS's contracts with its transportation customers, which were approved by the Commission, include a term that requires transportation customers to provide a daily balance of gas usage in order to allow PNMGS to deliver exact quantities needed by the customers. However, PNMGS experienced problems under these agreements, including the inability of transportation customers to provide accurate daily balancing, thereby failing to match the delivery of gas with usage. As a result, according to PNMGS's expert, Melvin Christopher, because PNMGS had an existing firm transportation agreement, as opposed to an interruptible transportation agreement, with El Paso Natural Gas Co., an interstate

pipeline, "transportation customers have been able to indirectly use this service [of firm transportation] while contracting for less expensive interruptible or capacity release service with El Paso." In other words, if transportation customers underestimate daily use, resulting in an under-delivery of gas to PNMGS's system from the transportation customers' supplier, these customers would still receive 100% of needed gas supplies from PNMGS's system without incurring reliability costs because PNMGS's sales customers are paying reliability costs to maintain a firm supply of gas regardless of the customer class actually using higher-priced firm gas supplies. PNMGS thus sought to rectify the inequitable distribution of reliability costs.

{91} The Attorney General and Staff supported PNMGS's proposal to allocate reliability costs between transportation customers and sales customers through the Rate Rider 12 mechanism. However, Staff's expert, Estevan Lopez, testified that PNMGS had not "quantitatively proven that transportation customers actually cause specific reliability related costs to be incurred or rely on system supply for reliability." "[N]otwithstanding the difficulty of proving or quantifying the level of service and the extent of that cost," Mr. Lopez nonetheless supported Rate Rider 12 because of several highly persuasive indicators, such as transportation customers' weather-sensitive loads resulting in peak demand and the lack of daily balancing on the part of transportation customers, which suggest that transportation customers relied on reliability service without incurring any reliability costs. Staff concluded that PNMGS's proposal represented "a reasonable attempt to address this problem."

{92} Various intervening transportation customers strenuously opposed the Rate Rider 12 proposal. USEA's expert, Mr. Kumar, testified that, while daily imbalances do occur for transportation customers, "[t]here is no evidence that transportation customer imbalances are increasing PNMGS' gas supply costs or the costs recovered from sales customers. In fact, there is evidence that transportation customer imbalances result in a net benefit to sales customers." Mr. Kumar concluded that PNMGS incurred no increased costs from transportation customer imbalancing and advocated that PNMGS's Rate Rider 12 proposal be rejected.

{93} The Commission determined:

While we recognize that transportation customers might receive benefits or incur costs for system reliability from time to time, . . . [w]e believe that Rate Rider 12 . . . should not be implemented without more comprehensive analysis in conjunction with a wide array of transportation service issues . . . .

As a result, the Commission denied any reallocation of reliability costs between transportation customers and sales customers. On appeal, PNMGS and the Attorney General argue that there was substantial evidence in the record for the Commission to determine an appropriate methodology for recovering reliability costs from transportation customers and that the Commission, by deferring resolution of this issue until a future proceeding, failed to fulfill its statutory obligation of setting just and reasonable rates. *See* § 62–8–7(D).

{94} Rate structure is a matter of public policy, *Mountain States,* 90 N.M. at 333, 563 P.2d at 596, and it is "based upon extremely complex and elusive information." *Id.* at 338, 563 P.2d at 601. As stated above, PNMGS bore the burden to prove the reasonableness of its proposed rate structure. There was a great deal of conflicting expert testimony in this case on the issue of transportation customers' responsibility for PNMGS's reliability costs. As Staff's expert, Mr. Lopez, stated, PNMGS and the Attorney General clearly established that some transportation customers likely benefit from reliability costs as a theoretical matter; however, PNMGS and the Attorney General did not establish that transportation customers, *as a class,* are responsible to any particular degree for PNMGS's reliability costs. Further, the evidence did not clearly establish that the Rate Rider 12 mechanism would fairly allocate reliability costs among the different classes of customers. *See generally* § 62–8–6 ("No public utility shall, as to rates or services, . . . subject any corporation or person within any classification to any unreasonable prejudice or disadvantage."). Although PNMGS introduced rebuttal testimony to counter the evidence provided by intervening transportation customers, we do not believe that the expert testimony in favor of Rate Rider 12 rendered incredible the expert testimony in opposition. *See Otero County Elec. Coop.,* 108 N.M. at 465, 774 P.2d at 1053. Thus, while PNMGS and the Attorney General demonstrated that transportation customers' possible responsibility for reliability costs is a noteworthy ratemaking issue that deserves attention by the Commission, we are unable to conclude that the Commission lacked substantial evidence to defer a change in rate structure on reliability costs until this issue could be more thoroughly examined.

{95} It is within the Commission's discretion to resolve a utility's petition for a rate increase by establishing just and reasonable rates, while also deferring resolution of ambiguous questions concerning rate structure. *See id.* Unlike *Mountain States*, in which the Corporation Commission improperly failed to exercise its affirmative obligation of setting rates after determining that the utility was entitled to an increase in revenue and having substantial evidence from which to establish just and reasonable rates, 90 N.M. at 333, 563 P.2d at 596, the Commission in this case fulfilled its statutory obligation of setting just and reasonable rates. *See id.* at 338, 563 P.2d at 601 ("Relating each customer's rate to the actual cost of the service rendered to him [or her], even if such cost were susceptible of ascertainment, would be highly impractical for it would lead to a multitude of varying rates."). The Commission's decision to defer resolution of the Rate Rider 12 issue for another proceeding "allowed [the Commission] to leave the utility's income stream intact, while preserving its mandate under Section 62–8–1 to determine the reasonableness of [the utility's] rate structure." *Otero County Elec. Coop.*, 108 N.M. at 465, 774 P.2d at 1053.

## B. Residential Access Fee

{96} PNMGS collects rates from residential customers through a fixed customer service charge, known as a residential access fee, and a variable commodity charge, which reflects an individual customer's gas usage based on a specified per-therm charge. A residential access fee is intended to cover customer costs that exist regardless of whether the customer uses gas and independent of the amount of usage by any particular customer. *See* Phillips, *supra*, at 431 (describing customer costs as including "a portion of the distribution system, local connection facilities, metering equipment, meter reading, billing, and accounting"). Under the rate structure in existence at the time PNMGS filed for an increase in rates, PNMGS's rates were designed with a $9.00 residential access fee. In petitioning the Commission to increase rates, PNMGS proposed a change in rate structure that would increase the residential access fee by 11%,

from the existing charge of $9.00 to $10.00. PNMGS's expert witness, Johnny Ray Johnson, testified that full customer cost of service for monthly service charges would be over $17.00 and that the $1.00 requested increase "represents a gradual movement toward full cost of service rates." Aside from this brief testimony, PNMGS introduced no other evidence supporting the increased residential access fee.

{97} The Attorney General specifically opposed an increase in the residential access fee. The Attorney General's expert, Mr. Ruback, testified that he believed that PNMGS's rate structure should not include a residential access fee because it "is anti-conservation. A fixed portion of a customer's bill eliminates the ability of the customer to control his [or her] bill and a higher charge reduces the commodity rate, thereby encouraging ... [a] wasteful use of energy." *See generally Washington Gas Light*, 450 A.2d at 1208 ("The higher the marginal cost of gas to the consumer (the commodity charge), the greater the incentive to reduce energy waste or to shift to lower cost energy sources."). Mr. Ruback testified that a fixed monthly service charge was also detrimental to competition in the utility industry. As an alternative to eliminating the monthly service charge, Mr. Ruback advocated that the charge should be reduced from $9.00 to $7.25. Mr. Ruback testified that, while PNMGS does have a certain level of customer costs, "Commissions have established a longstanding practice of pricing customer charges below the level of customer costs ... [because of] public acceptability, which is a valid rate design [criterion]." In accordance with this longstanding practice, the $10.00 access fee proposed by PNMGS would have been higher than the customer service charge of nineteen utilities in this region of the country. Additionally, Mr. Ruback testified that, if a customer service charge were to be designed to recover full customer costs, "those costs should only include the direct costs attributable to billing, collection, meters, and services.... I do not believe that indirect costs such as Administrative and General Expenses and General Plant should be considered direct costs" because these

indirect costs "do not vary directly with the number of customers on the system." *See generally* Phillips, *supra,* at 431 (stating that customer costs "vary with the number of customers"). Mr. Ruback explained that his proposed service charge of $7.25 reflected a full cost of service for all direct customer costs, and he contended that "[a]n additional increase of $1.00 [over the existing $9.00 fee] is entirely unjustified on a cost basis." PNMGS introduced no rebuttal testimony in response to the Attorney General's evidence.

{98}  The hearing examiner recommended retaining the existing residential access fee "since a rate decrease is called for in this case." The Commission, despite ordering a decrease in rates significantly larger than the hearing examiner's, ordered an increase in the residential access fee of over 60%, from $9.00 to $14.56. The Commission's only explanation for such a dramatic increase in the residential access fee was the comment of several members of the public in a separate proceeding about negative feelings toward high winter bills in comparison with summer bills caused by a lower fixed service charge and a higher per-therm charge. Although the Commission concedes that these comments are not properly considered as evidence in this case, the Commission took administrative notice of the comments for purposes of redesigning the access fee to collect 80% of overall cost of service. The Attorney General and PNMGS contend on appeal that the Commission's dramatic departure from the existing $9.00 residential access fee is unsupported by substantial evidence. We agree.

{99}  We acknowledge that the Commission has considerable discretion in the area of rate design. We also assume that the Commission, in exercising its expert judgment and in making public policy decisions necessarily implicated by rate design, may rely in part on public commentary in its task of evaluating the evidence in the record and formulating a proper rate structure. Nevertheless, the Commission cannot rely on its own expert judgment, regardless of the source of that judgment, as a substitute for evidence in the record. In this case, the Commission purported to be acting in re-

sponse to customer dissatisfaction with a low residential access fee. However, the only evidence in the record concerning customer response to service charges came from Mr. Ruback, who testified that utility commissions typically set customer charges below customer costs because a service charge "is widely misunderstood and often resented by customers." *Cf. Washington Gas Light,* 450 A.2d at 1201. Without substantial evidence in the record, we reject customer dissatisfaction as a basis for the Commission's action.

{100}  PNMGS proposed an increase in the residential access fee in order to move in the direction of a service charge reflecting full customer costs. Although PNMGS bore the burden "to prove the reasonableness of its entire rate structure," *Otero County Elec. Coop.,* 108 N.M. at 465, 774 P.2d at 1053, PNMGS introduced no evidence that a rate design that recovers a service charge reflecting full customer costs is just and reasonable. Specifically, there is no evidence in the record to refute Mr. Ruback's testimony that a higher residential access fee has a negative impact on both conservation and competition, both of which are relevant rate design factors, or to refute the evidence that establishes that the Commission's $14.56 access fee greatly exceeds the customer service charge for nineteen utilities in the region. *See Mountain States,* 90 N.M. at 339, 563 P.2d at 602 (listing factors appropriately considered in rate design, such as "cost of service," "existence of competition," and "comparison with other rates in other geographic areas"); *see also Washington Gas Light,* 450 A.2d at 1203 (discussing conservation); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 571, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (same); Phillips, *supra,* at 410–11 (same). We have previously discouraged the use of cost of service as a sole criterion in designing rates, *Mountain States,* 90 N.M. at 339, 563 P.2d at 602, and we reject the Commission's attempt to do so in this case without a basis in the record.

{101}  In any event, even assuming that the Commission had relied on Mr. Johnson's testimony concerning full cost of service recovery and Mr. Ruback's testimony that "[t]here is no rate design [criterion] or regu-

latory requirement that the customer charge recover a specific level of [customer] costs," there is no indication from the Commission's order that the Commission relied on a full customer cost model. The Commission's order states that the Commission "decided in this case to design rates which collect eighty percent of the cost of service allocated to the residential classes through an 'access fee' that will be charged to every residential consumer monthly, regardless of consumption." It is clear from the Commission's calculations that the Commission's reference to "cost of service" referred to overall cost of service, including both customer costs and commodity costs.[10] Even if the Commission had accepted Mr. Johnson's proposed full cost of service for *all* customer costs over Mr. Ruback's proposed full cost of service for only direct customer costs, no witness in this case testified that it would be appropriate to establish a rate design for a customer service charge based on a utility's overall cost of service. Without a basis in the record, we reject the Commission's attempt to design a customer service charge based on overall cost of service instead of customer cost of service.

{102} Finally, we note "that the generally accepted rate-making principles for the development of a sound rate design include continuity and stability." *United States v. Public Utils. Comm'n,* 635 A.2d 1135, 1143 (R.I.1993); *accord* Phillips, *supra,* at 410. The Commission has previously adhered to the principle of gradualism in establishing rate structures for public utilities in this State, and the Commission stated in its final order that "the guiding principle of rate design is to set rates which will move the relative rate of return of each end-use class closer to unity, or full cost of service contribution, *in a gradual manner that avoids rate shock.*" (Emphasis added.) Indeed, PNMGS's proposal of a $1.00 increase was intended to represent a gradual movement toward a full customer cost of service access fee. There is no testimony in the record concerning the effect that an unusually high access fee would have on consumers. Thus,

by increasing the residential access fee by over 60%, we believe the Commission improperly overlooked the potential that a dramatic shift in rates for residential consumers would cause rate shock, and the Commission thereby violated the fundamental rate-design principle of stability in rates. We therefore conclude that the Commission's residential access fee of $14.56 is not supported by substantial evidence in the record.

## IX. End Result of the Commission's Order

{103} Although we have determined that individual issues decided by the Commission are not supported by substantial evidence, the Commission nonetheless contends that this Court is bound to apply an "end result" test and that PNMGS fails to demonstrate that the end result of decreasing rates by approximately $6.9 million is unreasonable. *See Hope Natural Gas Co.,* 320 U.S. at 602, 64 S.Ct. 281 ("If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry ... is at an end. The fact that the method employed to reach that result may contain infirmities is not then important."), *quoted in part in Attorney Gen. v. New Mexico Pub. Serv. Comm'n,* 111 N.M. 636, 642, 808 P.2d 606, 612 (1991). While it is true that the Commission has considerable discretion in fixing rates charged by utilities, "this 'considerable discretion' does not mean ... that the [Commission's] authority is boundless." *Sandel,* 1999–NMSC–019, ¶ 16, 127 N.M. 272, 980 P.2d 55. Nor does the flexibility necessarily accorded the Commission in setting rates render this Court's review of its orders superficial in nature. While the result reached in a rate proceeding is ultimately controlling, we must review the method employed by the Commission and the Commission's application of its chosen methodology to the evidence in the record in order to determine in a meaningful way whether the result is unreasonable or unlawful.

{104} In this case, the Commission determined on the basis of substantial evi-

10. In fact, we estimate that the Commission's access fee of $14.56, producing a total revenue of $60,885,038, would have recovered over 84% of full customer costs based on Mr. Johnson's calculation of customer costs of $72,191,548.

dence that PNMGS is entitled to a rate of return on its investment of 9.17%. Given this determination, we believe that the Commission's decision to deny recovery for the costs involved in the reacquisition of debt, as well as the Commission's complete denial of the Mewbourne settlement costs and PNMGS's rate case expenses for this proceeding, unreasonably hinders PNMGS's ability to obtain the reasonable rate of return established by the Commission. *See, e.g., General Tel. Co.,* 98 N.M. at 757, 652 P.2d at 1208 ("The deduction of 41% from the rate of return determined to be just and reasonable is in conflict with the SCC's own finding as to the necessary rate of return, and exceeded the SCC's authority."); *Hobbs Gas Co.,* 94 N.M. at 734–35, 616 P.2d at 1119–20 (stating that the Commission's denial of a requested acquisition adjustment was not supported by substantial evidence and "resulted in a return on actual equity capital of only 7.5 percent rather than the 15 percent which the Commission admits to be a 'just and reasonable' return on equity"). We conclude that the end result of the final order is unreasonable and unlawful.

### X.   Conclusion

{105}   We conclude that the Commission's denial of recovery of losses on reacquired debt, the denial of the opportunity for PNMGS to recover reservation fees in a separate proceeding, the denial in their entirety of the Mewbourne settlement expenses and rate case expenses, and the dramatic increase in the residential access charge are not supported by substantial evidence in the record. We therefore conclude that the Commission's order is unreasonable and unlawful, and we vacate and annul the Commission's final order.

{106}   **IT IS SO ORDERED.**

MINZNER, C.J., BACA, FRANCHINI and MAES, JJ., concur.

